No. 47,609

KANSAS CITY STRUCTURAL STEEL COMPANY, *Plaintiff-Appellant,* v. L. G. BARCUS & SONS, INC., *Defendant-Appellee,* and TRAVELERS INDEMNITY COMPANY, *Defendant.*

(535 P. 2d 419)

Opinion filed May 10, 1975.

*Charles N. Henson,* of Topeka, and *Joseph J. Kelly, Jr.,* of Kansas City, Missouri, argued the cause, and *Ernest N. Yarnevich,* of Kansas City, Kansas, was with them on the brief for the plaintiff-appellant.

*D. Gary Hunter,* of Kansas City, argued the cause, and *John J. Ziegelmeyer,* also of Kansas City, was with him on the brief for the defendant-appellee.

The opinion of the court was delivered by

FONTRON, J.: This lawsuit started out as an action by the plaintiff, Kansas City Structural Steel Company, to collect the balance due on account from the defendant, L. G. Barcus & Sons, Inc. It

ended up being tried on a counterclaim filed by defendant against the steel company for breach of contract. The trial court entered judgment against the steel company on the Barcus counterclaim in the amount of $173,285. The steel company has appealed from that judgment.

Kansas City Structural Steel Company is a corporation engaged in manufacturing, supplying and erecting heavy structural steel. L. G. Barcus & Sons, Inc. is a general contractor engaged in the design and construction of roads, bridges and appurtenances thereto. The home offices of both companies are located in Kansas City, Kansas. For convenience the companies will hereafter be referred to as K. C. Steel, steel company, or plaintiff on the one hand, and Barcus or defendant on the other. The defendant, Travelers Indemnity Company, which is not involved in this appeal, was the bonding company for Barcus.

In September, 1968, the State of Kansas awarded Barcus a contract to widen the existing bridge on Seventh Street in Kansas City, Kansas, and to build two new ramps at the southern end of the bridge. This was known locally as the 7th Street project. The contract called for completion of the job within 250 working days and provided for payment of $280 per day liquidated damages in the event the project was not completed within that time.

Prior to being awarded the contract, Barcus had discussed structural steel prices with the plaintiff and had received verbal quotations. On September 24, 1968, K. C. Steel submitted a written proposal to Barcus confirming the prices orally quoted. A purchase order for structural steel was executed by Barcus and submitted to the steel company November 5, 1968. The order is shown to have been accepted by K. C. Steel through the signature of Robert H. Dill, its vice-president of sales.

At the commencement of the trial the court, on stipulation of counsel for both parties, entered judgment in favor of plaintiff on its account against defendant in the amount of $144,781.35, and the case proceeded to trial by the court on defendant's counterclaim. We are advised that the plaintiff's judgment against the defendant has since been paid. Hence, Travelers Indemnity Company has made no appearance in this court.

Defendant's counterclaim is predicated on the plaintiff's alleged failure to deliver structural steel according to the shipping schedule included in the purchase order. That portion of the purchase order reads:

"In that time is of the essence in the prosecution of this contract, it is agreed that the shipping schedule will be as follows:

"Starting approximately June 15, 1969 with completion approximately August 15, 1969."

According to the record, the project was substantially completed, so far as carrying traffic was concerned, in December 1970, although some handrailings appear to have been installed sometime the following April. It is not open to question that there was some delay in delivery, and the record reflects a good deal of argument pro and con as to what caused the delay and K. C. Steel's responsibility therefor. No one disputes that a strike of ironworkers occurred in the Kansas City area about April 1, 1969, and lasted until the middle part of July; that it closed down the unionized ready-mix concrete plants in the area, including the plant from which Barcus obtained its concrete to build the piers and abutments; that Barcus ceased pouring concrete shortly after April 1, and the steel company, when its president became aware of the stoppage, cut back its production of structural steel for the 7th Street job. There was crimination and recrimination between the steel company and Barcus as to why Barcus stopped pouring the piers; why the cutback was ordered; why Barcus was not notified of the cutback until early May and what effect it had on the progress of the work. All in all it would appear there was at least some lack of communication between the two companies. Be that as it may, delivery of structural steel was begun not later than early September, 1969, K. C. Steel having been told in the meantime that delivery would be wanted six weeks after the strike ended. Deliveries appear to have continued regularly during the remainder of the work. The record reflects there were other causes contributing to work delays, including changes made by the state in the plans and specifications for the project. Disputes also arose between the contracting parties at the trial as to whether the defendant was ready to take the steel when it was available for delivery.

We believe it would prove fruitless, however, to dwell further on the numerous points of conflict existing between the parties during this litigation. The work was finally finished in 232 working days as computed by the state—this being well within the time allotted for completion. As a consequence, the state assessed no penalties against Barcus.

During the latter part of 1970 the defendant got behind in pay-

ments due plaintiff, despite numerous attempts on plaintiff's part to effect collection. Eventually, on May 6, 1971, the steel company billed Barcus for the entire balance due in the amount of $132,489.65 (later established by stipulation as $144,781.35). Ten days later, and for the first time Barcus had mentioned the subject, K. C. Steel was billed for $173,285 in damages claimed to be due for added expense incurred by Barcus caused, so it was said, by plaintiff's delay in delivering structural steel.

The plaintiff has asserted a number of defenses in opposition to defendant's counterclaim and has raised several points on appeal. However, throughout the entire course of litigation, the steel company's primary reliance appears to be placed on the exculpatory clause contained in the Barcus purchase order. It reads as follows:

"All of the terms and conditions of the plans and specifications and contract documents between the Owner and the Purchaser which are applicable to the materials to be furnished under this Purchase Order shall become a part of this purchase, as if written herein; provided, however, Kansas City Structural Steel Company shall not be responsible for any damages for any delay in its performance unless such delay is not excusable thereunder or is not of the type for which an extension of time may be granted thereunder and unless such delay is the sole cause of delay to the Purchaser for which the Purchaser is assessed and pays damages thereunder."

K. C. Steel's argument amounts to this: Inasmuch as the project was completed within the number of working days contemplated by the state as set out in the prime contract, and since the state has assessed no damages against Barcus for any delays, the proviso in the foregoing clause precludes Barcus from claiming damages from K. C. Steel. The validity of this contention depends on the proper construction of the exculpatory clause.

Before we proceed further note should be taken of the fact that the exculpatory proviso is part and parcel of the clause which incorporates into the Barcus purchase order all the terms and conditions of the plans and specifications and contract documents between the state, which is designated in the clause as Owner, and Barcus, the prime contractor, which is designated as Purchaser.

The proviso itself was not ignored by the trial court in entering judgment for Barcus, but the construction placed upon it appears to us as open to serious question. The following findings set forth in the journal entry indicate the rationale on which the court found in favor of Barcus:

"This Court finds:

"1. That the 'Steel Co. shall not be responsible for any damages for any delay in its performance unless such delay is not excusable thereunder.'

OR

"2. 'is not of the type for which an extension of time may be granted thereunder AND unless such delay is the sole cause of delay to the Purchaser for which the Purchaser is assessed and pays damages thereunder.'

"Since Barcus was neither assessed nor required to pay any damages to the State, this portion of the contract does not concern us and the Court so finds.

"We must then consider the questions of whether there was a delay by Steel Co. in its performance and, if so, whether 'such delay is not excusable thereunder.'"

Having arrived at these findings, the court proceeded further to find there was delay in performance on the steel company's part and that the delay was not excusable. Hence, judgment was entered in favor of Barcus for the full amount requested.

While we make no pretense of being accomplished grammarians, it is our opinion the trial court has mispunctuated the proviso in the process of misconstruing it. Despite diligent search, we find no period or other punctuation mark placed before the disjunctive word "or" in the exculpatory proviso, nor do we find that the words "or" and "and" are capitalized as the trial court has seen fit to do in its findings. The court's restructuring of the proviso imports a different meaning than the one we would ascribe to it.

As we read the clause, while it may not be perfectly phrased, damages cannot be claimed unless (1) the delay is not excusable under the prime contract or (2) is not of the type for which an extension of time can be granted under that contract, and in neither case may damages be claimed *unless* the delay is the sole cause of delay for which Barcus is assessed and pays damages under the prime contract. In other words, the second subordinate phrase beginning with "unless" refers to and modifies the preceding two types of delay described.

As the plaintiff points out in its brief no reason has been advanced for the parties to have distinguished between the two types of delay so far as relieving plaintiff from liability for damages is concerned. Under the court's construction, as we read it, liability for delay which is not excusable under the state contract would be unlimited while liability for delay for which no extension of time could be granted under that contract would be limited. We see no valid reason for the distinction. K. C. Steel also suggests that were we to interpret the proviso as the trial court has done, the second "unless

such delay" would be meaningless, which is to say, the Barcus interpretation would be stated more clearly were the second "unless such delay" omitted entirely. We believe this is so.

The word "unless" is a subordinating conjunction in common usage, connecting a dependent or subordinate clause of a sentence with the main or primary clause. Subordinate sentence elements are said to modify the sentence as a whole. (Porter G. Perrin, Writer's Guide and Index to English [3d Ed.] 479.) "Repeating a conjunction at the beginning of each element", Professor Perrin points out, "gives distinctness to each element, avoids possible confusion, and gives the advantage of clear-cut parallelism." (Id., 479.)

A brief discussion as to the use of *unless* is found in *Graham v. Elevator Co.*, 115 Kan. 143, 144, 222 Pac. 89, an action in which an attorney's lien was involved. In that case the court said:

". . . The meaning of 'unless' is: 'Upon any less condition than (the fact or thing stated in the sentence or clause which follows): . . .' (Webster's International Dictionary.) Unless the condition be met, there can be no lien."

So here, unless the condition of Barcus being assessed damages for delay under its contract with the state is met, there can be no liability on the part of K. C. Steel to pay damages for whatever delay, if any, it may have caused.

In support of the trial court's interpretation of the exculpatory provision, the defendant cites authority to the effect that "or" is not a conjunctive, but a disjunctive, word. With this authority, we can have no quarrel. However, the "or" of the clause here in question has been placed in the first part of the proviso between the two types of delay for which damages may be awarded. On the other hand, the conjunction "and" is used later in connection with the second dependent clause introduced by "unless." In the Perrin work it is said that "*and* is the most used connective joining two or more elements in a series. In its typical use, the elements are of equal grammatical rank." (p. 429.)

The exculpatory provision, construed in a grammatical context, relates the payment of damages by the steel company to damages assessed against Barcus under the prime contract. No delay damages were charged against the Barcus firm, and none were paid. Moreover, not a single delay which was noted by the state's inspectors, although not charged against Barcus, was for late delivery of structural steel.

Before leaving this aspect of the case it may not be amiss to suggest that the defendant's long delay in asserting a claim for delay damages may have been due to a belated construction of the damage clause, a construction not advanced by Barcus while work was in progress or until the steel company, a considerable time thereafter, presented its bill for payment.

We conclude that under the exculpatory clause either type of delay, *i. e.*, inexcusable delay in performance, or delay of a type for which no extension of time may be granted, must have resulted in assessment of damages to Barcus before Steel would become liable to Barcus in damages.

Barcus contends, however, that unless the exculpatory clause be given the construction adopted by the trial court, the same would be unconscionable and would offend provisions of the UCC, quoting K. S. A. 84-2-719 (3), in part, and citing comments thereunder. Section 84-2-719 relates to contractual modification and limitation of remedy. So far as pertinent, subsection (1) is to the effect that an agreement may limit the measure of damages recoverable. Subsection (3) reads as follows:

"(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

The Kansas Comment reads in part:

"This section generally leaves the parties free to shape their own remedies by contract and to limit or modify the remedies authorized by this article. It is the policy of the Code, however, that at least minimum adequate remedies must be available. . . ."

In the Official UCC Comment the following language is found:

"1. Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.

"However, it is of the very essence of a sales contract that at least minimum adequate remedies be available. . . .

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"3. Subsection (3) recognizes the validity of clauses limiting or excluding consequential damages but makes it clear that they may not operate in an unconscionable manner. Actually such terms are merely an allocation of unknown or undeterminable risks. . . ."

The exculpatory clause before us does not totally exclude liability for damages in case of a breach, although there is respectable authority that even *total* exclusion of consequential damages may

be the subject of a valid provision in a commercial sales agreement entered into at arms' length. (*K & C, Inc. v. Westinghouse Elec. Corp.*, 437 Pa. 303, 263 A. 2d 390; *Dow Corning Corporation v. Capitol Aviation, Inc.*, 411 F. 2d 622, 626, 627; *Bakal v. Burroughs Corp.*, 74 Misc. 2d 202, 343 N. Y. S. 2d 541, 544.) In the instant case, it is true, K. C. Steel's liability for damages was severely limited by the exculpatory clause, but the same limitation was included in a prior contractual arrangement between the same parties and was inserted by Barcus itself in the present purchase order. Accordingly, both parties were familiar with the contents of the clause—it was, in fact, no stranger to either one.

The policy of the law in general is to permit mentally competent parties to arrange their own contracts and fashion their own remedies where no fraud or overreaching is practiced. Contracts freely arrived at and fairly made are favorites of the law. (*Kansas Power & Light Co. v. Mobil Oil Co.*, 198 Kan. 556, 426 P. 2d 60.) None of the parties here involved were neophytes or babes in the brambles of the business world. Both companies, it would appear, dealt in projects involving considerable sums of money; both operated substantial business enterprises; and there is no suggestion that their businesses were not capably managed and profitably operated. The trial court did not find the limitation on damages imposed by the exculpatory clause was unconscionable, and we cannot view it as such. The limitation imposed was not total and was agreed upon by parties standing on equal footing.

The judgment of the district court is reversed with directions to enter judgment for the plaintiff on the defendant's counterclaim.

FROMME, J., not participating.